(No. 31987.—

EUGENE ORME *vs.* THE NORTHERN TRUST COMPANY *et al.* —(J. HOWARD McGRATH, Attorney General of the United States, Appellee, *vs.* ADELHEIDT A. N. E. VON HARDENBERG *et al.,* Appellants.)

*Opinion filed November 27, 1951.*

Roland Towle, and Norman J. Barry, both of Chicago, for appellants.

Harold I. Baynton, of Washington, D. C., and Otto Kerner, Jr., United States Attorney, and Herman Smith, both of Chicago, and James D. Hill, George B. Searles, and Richard Cosway, of the Department of Justice, for appellee.

Mr. Justice Crampton delivered the opinion of the court:

Defendants-appellants, resident German nationals, question the right of the Attorney General of the United States to vest, in the United States Government, their interests in certain property, under the Trading with the Enemy Act. (40 Stat. 411; U.S.C., 50 App. sec. 1.) The circuit court of Cook County, in a case pending in that court, upheld the vesting orders, substituted the Attorney General as party defendant in their place and dismissed defendants-appellants from the suit.

In 1943, a suit was instituted in the circuit court of Cook County to construe the will of Louisa G. Bigelow, a United States citizen, who died in Switzerland in 1873, leaving a will which created a trust for the lives of her three granddaughters, one of whom was living when the suit was filed. One of the granddaughters, Louise de Haven, in 1941, attempted by her will to devise and bequeath her interest in that trust to plaintiff, Eugene Orme, a stranger. Appellants are the daughters and only heirs of Louise de

Haven, the granddaughter of Louisa G. Bigelow, and contend their mother had no vested rights in the trust which were disposable by will. These issues remain undetermined in the lower court. Appellants were served by publication because they resided in Germany during the hostilities of World War II. The Alien Property Custodian filed his appearance for appellants under the provisions of the Trading with the Enemy Act. Later, by executive order number 9788, 11 Fed. Reg. 11981, Oct. 14, 1946, the powers of the Alien Property Custodian were transferred to the Attorney General, and in the spring of 1949, nearly five years after cessation of hostilities with Germany, the Attorney General issued two vesting orders, numbers 13022 and 13192, of the claimed interest of appellants in said trust, amounting to more than $600,000, consisting of the underlying fee of one of Chicago's large department stores. Thereafter, the Attorney General petitioned and the lower court ordered the removal of the appellants from the case and the substitution of the Attorney General in their stead. The appellants appeal to this court claiming their dismissal from the case and the vesting of their interest in the trust violates the due-process clauses of the Federal and Illinois constitutions and international law. The construction of the wills of Louisa G. Bigelow and Louise de Haven and the claims of plaintiff and the other parties are not here involved.

The sole question presented by this record is the power of the Attorney General to vest the fee or interests of foreign nationals, with whom we were officially still at war, after the cessation of hostilities, under the Trading with the Enemy Act, as amended. The query is an interesting and unusual one to be presented to this court for decision and involves an underlying issue of Federal and international law.

Appellants contend they are entitled to the protection of the fifth amendment to the constitution as alien friends.

Both sides have furnished us with instructive and scholarly briefs, and treat, with the historical background, of the extermination and enslavement and the confiscation of the property of a vanquished foe, reaching back to and beyond the Magna Charta. Appellants further assert the Trading with the Enemy Act, passed in 1917, was for the purpose of making available to us the sinews of war and to prevent and avoid the possibility of having used against us the property of our enemies during the period of hostilities. They insist it was not a confiscatory measure nor one to emasculate a conquered enemy. They cite all of our measures taken since the cessation of hostilities, including the Marshall Plan; the Air Lift; the CARE program; the resumption of trade; the abolishment of the office of Alien Property Custodian; the subsequent proclamation of the President of the United States declaring the ending of the freezing orders, which prevented fiduciaries from sending money or property to nationals of countries with which this country had been at war, and permitting German nationals to inherit from United States citizens who died after December 31, 1946, and other instances; all as indicative of the policy of our government to promote the rehabilitation of the enemy rather than to impose reparations through the seizure of the property of enemy nationals. They call attention to the fact that the Alien Property Custodian did not vest this interest during World War I nor did he do so during the pendency of this case, knowledge of which he had as established by his intervention in the suit. Stress is also placed upon the nature of the property interest here, namely, an underlying fee to real property located in this State, useless to the enemy, except insofar as it was capable of producing income. This being so, appellants attempt to change the question from a legal to a moral one, contending the idea that we were still at war with Germany is a pure fiction. (See dissenting opinion *Ludecke* v. *Watkins,* 335 U.S. 160, 175, 92 L. ed.

1881 (1948).) Appellants make a final appeal upon the basis that since Germany has ceased to exist as a nation by the declaration of Berlin on June 5, 1945, by the Four Powers, there no longer exists a German sovereign, and its total destruction as a hostile sovereign, the cessation of hostilities, and the subsequent occupation constituted an end to the state of war heretofore existing, and thus ended the power to vest under the Trading with the Enemy Act.

Section 7(c) of this act provides the authorization for the seizure of property of an "enemy." Section 2 of the act defines an enemy as a resident of a country with which the United States "is at war" and also defines the end of the war to be "the date of proclamation of exchange of ratification of the treaty of peace, unless the President shall, by proclamation, declare a prior date * * *." The usual method of terminating a war is by treaty. The act, of course, was passed to insure our national safety and, to this end, must be construed accordingly. War and the international law of war and treaties is undergoing a change brought about by the all-encompassing and engrossing effects of the world-wide nature of the conflicts. War, prior to World War I, was generally engaged in between two belligerents and has been defined as a contest by force between two nations. The conflict of 1914-1918 engulfed the armed forces of many nations at different times during those years. World War II has been said to have been merely a revived continuation of that conflict but with different alignments between the contending nations. It is readily apparent that before a treaty can be effectuated with Germany, in whole or in part, new alignments between nations are and will be in the making unless this country and its allies of World War II, or the nations composing the United Nations, are able to solve the serious and urgent problems and crises preventing the making of a lasting peace. To this end we have dedicated our tireless energies, within the declared purposes of the Atlantic and

the U. N. charters, never, however, relinquishing or over-looking the cardinal principle that the Federal constitution is the supreme law of our land.

The war powers of Congress are conferred by article I, section 8, clause 11, of the constitution of the United States, which provides that Congress shall have power "to declare War, grant Letters of Marque and Reprisal, and makes Rules concerning Captures on Land and Water." Clause 18 of the same article and section grants to Congress the power "to make all Laws, which shall be necessary and proper for carrying into Execution the foregoing Powers." The appellants concede that, under the war powers, property can be vested during hostilities as against enemy aliens. The cases so holding are legion. Frequently, the Supreme Court has passed upon the challenged power of the government to confiscate or vest enemy property and the power has been upheld. A few of the cases so holding are: *Stoehr* v. *Wallace,* 255 U.S. 239, 65 L. ed. 604 (1921); *Central Trust Co.* v. *Garvan,* 254 U.S. 554, 65 L. ed. 403 (1921); *Commercial Trust Co.* v. *Miller,* 262 U.S. 51, 67 L. ed. 858 (1923); *Miller* v. *United States,* 11 Wall. 268, 20 L. ed. 135. The power being present, it is a political question and the wisdom or advisability of the action is not open to review by the courts. (*Ludecke* v. *Watkins,* 335 U.S. 160, 92 L. ed. 1881 (1948); *Hirabayashi* v. *United States,* 320 U.S. 81, 87 L. ed. 1774.) Of the many cases cited by the Attorney General, the vast majority were cases where the vesting order was entered during the period of hostilities, and in some the court was concerned with an act relating to war powers exercised during hostilities. In others, however, there was a vesting after the end of hostilities. *Feyerabend* v. *McGrath,* 189 Fed. 2d 694; *Clark* v. *Cont. Nat. Bank,* 88 Fed. Supp. 324.

Appellants persist in the contention that the war concluded upon the cessation of "hostilities," employing this term in the sense of actual combat or overt acts of open

warfare. This construction of the termination or conclusion of a war has been repeatedly rejected, even in the absence of specific provisions to the contrary in the act creating the war power. (*Hamilton* v. *Kentucky Distilleries & Warehouse Co.* 251 U.S. 146, 166, 64 L. ed. 194, 203, and cases cited therein.) The Supreme Court of the United States has recently held that legislation enacted after the cessation of hostilities, in furtherance of the war power, and to alleviate conditions created and caused by the war, is not unconstitutional and that the war power does not end with the cessation of hostilities. (*Woods* v. *Miller*, 333 U.S. 138, 92 L. ed. 596 (1948).) Likewise, the power of the President to remove aliens "deemed by the Attorney General to be dangerous" under the Alien Enemy Act has only lately been upheld, the court saying "War does not cease with a cease-fire order, and power to be exercised by the President such as that conferred by the Act of 1798 is a process which begins when war is declared but is not exhausted when the shooting stops." *Ludecke* v. *Watkins*, 335 U.S. 160, 167, 92 L. ed. 1881, 1887.

This court can and will take judicial notice that there has been no treaty of peace concluding World War II and that the President had not, prior to the proclamation signed October 24, 1951, pronounced "the end of the War." Officially, at the time the vesting orders were entered, we thus were still in a state of war with Germany. The authority to proclaim its termination rests with the Congress, the power which declared the necessity of war, or with the President, to whom Congress has delegated the authority. (*Commercial Trust Co.* v. *Miller*, 262 U.S. 51, 67 L. ed. 858 (1923).) It is not for us to inquire into the purposes of the government in making this seemingly unwarranted and unnecessary seizure. We may or we may not agree with the course followed in vesting these interests. But we are not permitted to speculate as to the reasons for the

action taken. It is not for the courts to examine economic or political aspects of the policy established by the departments of government in the fields of their authorized discretion. Even presuming we were equipped to do so, (a presumption we do not indulge in,) we would still be outside the scope and realm of proper judicial functions. That there are no restrictions upon the war power of Congress to confiscate enemy-owned property is no longer debatable. The right is absolute and the extent to which that right shall be exercised is a matter of policy to be determined solely by Congress. Courts may inquire whether an act passed by Congress is within the scope of its constitutional *power*. Beyond this they may not go and cannot extend their inquiry to a review of legislative *policy*. The wisdom or soundness of theory or principle are matters solely for the judgment of Congress and such matters are not within the range of judicial cognizance. *United States* v. *Chemical Foundation,* 294 Fed. 300, affd. 5 Fed. 2d 191, affd. 272 U.S. 1, 71 L. ed. 131.

The War Claims Act of 1948 (62 Stat. 1240; U.S.C., 50 App., sec. 2001 *et seq.*) provides that net proceeds of vested property shall be covered into the Treasury to be used for payment of claims of Americans who, as internees or prisoners of war, suffered as a result of the wartime acts of our enemies. (See *Propper* v. *Clark,* 337 U.S. 472, 484, 93 L. ed. 1480, 1491 (1949). The confiscation of enemy property has no reference to the personal guilt of the owner and the act of confiscation is not a proceeding against him. The confiscation is not because of crime but because of the relation of the property to the opposing belligerent, a relation in which it has been brought in consequence of its ownership. (*Miller* v. *United States* (*Page* v. *United States*) 11 Wall. 268, 305-6, 20 L. ed. 135, 144 (1871).) By virtue of the declaration of war upon us by Germany, the appellants, being German nationals, had their

property subjected to confiscation and vesting under a duly authorized war power as proscribed by an act of Congress and as amended by Presidential order as provided therein, the war not then having been terminated by treaty or by proclamation according to the terms and provisions of the act.

Appellants further contend the constitution of Illinois is here contravened. The constitution of Illinois was not designed as a limitation upon the sovereign powers of the United States. No war power delegated to the Federal Government may be contravened or limited by the State constitution. (Const. of the United States, article VI.) The complete and undivided character of the war power of the United States is not disputable and it is elementary that the constitution of the United States is paramount when exerted as to subjects concerning which it has the power to control. *Northern P. R. Co.* v. *North Dakota,* 250 U.S. 135, 63 L. ed. 897.

What we have said here is without prejudice to appellants to again seek a revesting of their property by appropriate proceedings or petition, a matter, of course, which is not here for decision. It is not within the scope of the issues of this case to discuss or decide the future rights of belligerents whose properties have been confiscated or the nature or extent of our trusteeship, if any, during the time the official state of war continued to exist. See Maxey on International Law, L. 430; Faulke on International Law, vol. 11, p. 878; American Journal of International Law, (July, 1924) vol. 18, p. 532.

The Supreme Court of the United States has spoken as to the issues and principles governing this case, as outlined above, and we are bound by its decisions. The order of the circuit court of Cook County appealed from must be affirmed.

*Order affirmed.*